**EDWARDS**

v.

**ERDEY et al.**

2001-Ohio-4367.]

Court of Common Pleas of Ohio,
Franklin County.

No. 00 CVA 07–6754.

Decided Nov. 28, 2001.

---

Gerald S. Leesberg and Susie Hahn, for plaintiff.

Robert L. Berry, for defendants Cayman Surgical Group, Ltd. and Steven L. Ziemba.

Michael D. Jeffers, for defendants Richard A. Erdey, M.D. and Richard A. Erdey, M.D., Inc.

---

LISA L. SADLER, Judge.

{¶ 1} This matter is before the court on the motion to dismiss filed by defendants Cayman Surgical Group, Ltd., and Steven L. Ziemba (hereinafter collectively "the Cayman defendants"). The motion has been fully briefed and, pursuant to Loc. R. 21.01, is deemed submitted for decision.

## I. Introduction

{¶ 2} Plaintiff Kathryn L. Edwards (hereinafter "plaintiff") was diagnosed with severe myopia or nearsightedness. Hoping to find an alternative to wearing glasses or contact lenses, she sought an evaluation from defendant Richard A. Erdey, M.D., in Columbus, Ohio ("defendant Erdey"). Defendant Erdey discussed with plaintiff the option of intraocular lenses, or "ICL,"[1] which are essentially contact lenses that are surgically implanted onto the lens of the eye. According to the parties, the intraocular lens procedure has been approved in Europe but has not yet completed clinical trials or been approved for use in this country by the United States Food and Drug Administration. Because plaintiff's age precluded her participation in ongoing FDA clinical trials, defendant Erdey recommended that she contact the Cayman defendants. Defendant Cayman Surgical Group offers the intraocular lens procedure in the Cayman Islands, a British territory in the Caribbean Sea.

{¶ 3} Plaintiff visited the website of defendant Cayman Surgical Group at www.phirst.com.[2] Through an e-mail link on the website, plaintiff on June 24, 1999, sent a general inquiry regarding Cayman Surgical Group, its doctors, its procedures, and its prices. Defendant Ziemba responded to plaintiff's inquiry by reply e-mail that same day, and subsequently plaintiff and defendant Ziemba exchanged a series of e-mails culminating in the scheduling of plaintiff's ICL surgery with Cayman Surgical Group in the Cayman Islands on August 20, 1999. The fee for plaintiff's surgery was $2,615 per eye.

{¶ 4} The procedure established by the Cayman defendants was as follows: Before traveling to the Cayman Islands, plaintiff had an appointment with

---

1. "ICL" is short for "implantable contact lens" and is, apparently, a trademark of STAAR Surgical Company of Monrovia, California. Defendant Ziemba, who is chairman of defendant Cayman Surgical Group, Ltd., is also a vice president of STAAR.

2. According to plaintiff, the website of defendant Cayman Surgical Group is no longer on line. Attached to the submitted affidavit of Susie Hahn, however, are printouts of several pages of the former website as they appeared when the site was last revised on July 21, 1999.

defendant Erdey in Columbus. Defendant Erdey performed an iridotomy—a surgical procedure in which a laser is used to make two small holes in the iris of each eye—on plaintiff in order to prevent the buildup of intraocular fluid following the implantation of the ICL. Defendant Erdey was also to perform plaintiff's followup care in Columbus after her return from surgery in the Cayman Islands. Defendant Erdey's fee for these services—$1,000—was included in the $2,615 per eye charged to plaintiff by defendant Cayman Surgical Group.

{¶ 5} Following the iridotomy by defendant Erdey in Columbus, plaintiff flew to the Cayman Islands for the intraocular lens procedure. According to plaintiff, she was transported to "a small storefront in a nondescript strip mall." There, she was administered eyedrops that dilated her eyes and then was given a 12–page "consent form" to read and sign. After signing the form, plaintiff was taken into surgery.

{¶ 6} Plaintiff's surgery was performed by Dr. David Brown. Dr. Brown was one of several doctors selected by defendant Ziemba to periodically travel from the United States to the Cayman Islands for the sole purpose of performing the intraocular lens procedure for the Cayman Surgical Group. According to defendant Ziemba's deposition testimony, the Cayman Surgical Group maintained no permanent staff or physicians in the Cayman Islands. In fact, on days when patients were scheduled for a surgical procedure, the company leased its facility in the Cayman Islands on an hourly basis.

{¶ 7} According to plaintiff's affidavit, after the surgery her vision in both eyes was initially blurry. By the afternoon of the next day the vision in her right eye had cleared. Two days after the surgery, however, plaintiff was experiencing a headache and worsening vision in her left eye. She returned to see another ophthalmologist associated with the Cayman defendants, who treated her for increasing intraocular pressure and recommended that she fly home immediately.

{¶ 8} On her return flight to Ohio, plaintiff became very ill. Upon her arrival at Port Columbus International Airport, she was taken to the emergency room at Mount Carmel Hospital, where she was given intravenous medication and was told to return the next morning for another iridotomy with defendant Erdey. That procedure was performed by defendant Erdey the next day and successfully relieved the increased intraocular pressure. Subsequently, however, plaintiff developed a cataract in her left eye and has allegedly suffered permanent decreased vision in that eye due to the prolonged period of increased intraocular pressure.

{¶ 9} Plaintiff filed the instant action in July 2000 and seeks damages from defendants on various tort theories. Defendant Erdey has filed a cross-claim against the Cayman defendants for indemnification and/or contribution. The

Cayman defendants now move to dismiss plaintiff's complaint for lack of personal jurisdiction and failure to state a claim upon which relief can be granted.

## II. The Motion to Dismiss for Lack of Personal Jurisdiction

{¶ 10}  When determining whether a state court has personal jurisdiction over a foreign corporation, the court is obligated to engage in a two-step analysis. First, the court must determine whether the state's "long-arm" statute and applicable civil rule confer personal jurisdiction.  If so, the court must then consider whether finding jurisdiction under the statute and the rule would deprive the defendant of the right to due process of law pursuant to the Fourteenth Amendment to the United States Constitution.  *U.S. Sprint Communications Co. Ltd. Partnership v. Mr. K's Foods, Inc.* (1994), 68 Ohio St.3d 181, 183–184, 624 N.E.2d 1048.

### A.  Jurisdiction Under Ohio's Long–Arm Statute

{¶ 11}  Plaintiff asserts that jurisdiction is proper under subsection (A)(1) of Ohio's long-arm statute, R.C. 2307.382.  That subsection provides:

{¶ 12}  "(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:

{¶ 13}  "(1) Transacting any business in this state[.]"

{¶ 14}  The Supreme Court of Ohio, in *Mr. K's Foods,* supra, observed the following:

{¶ 15}  "Under R.C. 2307.382(A)(1), a foreign corporation submits to the personal jurisdiction of an Ohio court if its activities lead to '[t]*ransacting any business*' (emphasis added) in Ohio. Because it is such a broad statement of jurisdiction, R.C. 2307.382(A)(1) has given rise to a variety of cases which 'have reached their results on highly particularized fact situations, thus rendering any generalization unwarranted.'  22 Ohio Jurisprudence 3d (1980) 430, Courts and Judges, Section 280.  With no better guideline than the bare wording of the statute to establish whether a nonresident is transacting business in Ohio, the court must, therefore, rely on a case-by-case determination."  Id. at 185, 624 N.E.2d 1048.

{¶ 16}  This case presents the unusual situation in which the Cayman defendants were engaged in a business which, if physically located within the boundaries of the state of Ohio, would not have been legal.  This is because, as already noted, the intraocular lens procedure had not yet been approved for use in the United States by the United States Food and Drug Administration.  Consequently, as defendant Ziemba testified at 16 of his deposition transcript, "Cayman Surgical Group was or is a company designed to facilitate offshore surgeries of—

I'll leave it at that. Of offshore surgeries." It follows that the Internet was of some importance to the Cayman defendants in publicizing their services and making them available to residents of Ohio and of the United States generally. Defendant Erdey testified, in fact, that he specifically referred plaintiff to the Cayman Surgical Group website—and to no one else's—because plaintiff "was requesting access to this technology * * * and that was the only organization that I knew of that she might have access to this technology outside of the United States." Erdey deposition transcript at 17.

{¶ 17} The relationship between the Internet and personal jurisdiction was discussed at length in the oft-cited case of *Zippo Mfg. Co. v. Zippo Dot Com, Inc.* (W.D.Pa.1997), 952 F.Supp. 1119, 1123–1124:

{¶ 18} "In *Hanson v. Denckla,* the Supreme Court noted that '[a]s technological progress has increased the flow of commerce between States, the need for jurisdiction has undergone a similar increase.' *Hanson v. Denckla,* 357 U.S. 235, 250–51, 78 S.Ct. 1228, 1237–39, 2 L.Ed.2d 1283 (1958). Twenty-seven years later, the Court observed that jurisdiction could not be avoided 'merely because the defendant did not *physically* enter the forum state.' *Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184 [85 L.Ed.2d at 543]. The Court observed that:

{¶ 19} " '[I]t is an inescapable fact of modern commercial life that a substantial amount of commercial business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted.' Id. Enter the Internet, a global ' "super-network" of over 15,000 computer networks used by over 30 million individuals, corporations, organizations, and educational institutions worldwide.' *Panavision Intern., L.P. v. Toeppen,* 938 F.Supp. 616 (C.D.Cal.1996) (citing *American Civil Liberties Union v. Reno,* 929 F.Supp. 824, 830–48 (E.D.Pa.1996)). 'In recent years, businesses have begun to use the Internet to provide information and products to consumers and other businesses.' Id. The Internet makes it possible to conduct business throughout the world entirely from a desktop. With this global revolution looming on the horizon, the development of the law concerning the permissible scope of personal jurisdiction based on Internet use is in its infant stages. The cases are scant. Nevertheless, our review of the available cases and materials reveals that the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet. This sliding scale is consistent with well developed personal jurisdiction principles. At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. E.g. *Compu-*

*Serve, Inc. v. Patterson*, 89 F.3d 1257 (6th Cir.1996). At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. E.g. *Bensusan Restaurant Corp. v. King*, 937 F.Supp. 295 (S.D.N.Y.1996). The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site. E.g. *Maritz, Inc. v. Cybergold, Inc.*, 947 F.Supp. 1328 (E.D.Mo.1996)." (Emphasis in original and footnotes omitted.)

{¶ 20} Applying the *Zippo* sliding scale to the case at bar, it is apparent from the exchange of correspondence initiated through the website's e-mail link that the Cayman Surgical Group site lies in the "middle ground" of websites in which a user such as plaintiff can exchange information with the host. Upon review of "the level of interactivity and the commercial nature of the exchange of information" that occurred, the court concludes that the Cayman defendants transacted business in this state and that jurisdiction in Ohio is therefore proper under R.C. 2307.382(A)(1).

### B.   Jurisdiction Under the Fourteenth Amendment

{¶ 21} The constitutional limitations on the exercise of personal jurisdiction differ depending upon whether a court seeks to exercise *general* or *specific* jurisdiction over a nonresident defendant. General jurisdiction permits a court to exercise jurisdiction over a nonresident defendant when the defendant has engaged in "systematic and continuous" activities in the forum state. In the absence of general jurisdiction, specific jurisdiction permits a court to exercise personal jurisdiction over a nonresident defendant for forum-related activities where the "relationship between the defendant and the forum falls within the 'minimum contacts' framework" of *Internatl. Shoe Co. v. Washington* (1945), 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, and its progeny. See, e.g., *Zippo*, supra, 952 F.Supp. at 1122. Plaintiff does not urge this court to exercise general personal jurisdiction over the Cayman defendants. Rather, she asserts that the exercise of specific personal jurisdiction is proper. This court agrees.

{¶ 22} A three-pronged test has emerged for determining whether the exercise of specific personal jurisdiction over a nonresident defendant is appropriate:

{¶ 23}   (1) The defendant must have sufficient "minimum contacts" with the forum state;

{¶ 24} (2) The claim asserted against the defendant must arise out of those contacts; and

{¶ 25} (3) The exercise of jurisdiction must be reasonable. *Zippo, supra,* at 1122–1123.

{¶ 26} "The 'Constitutional touchstone' of the minimum contacts analysis is embodied in the first prong, 'whether the defendant purposely established' contacts with the forum state. * * * Defendants who 'reach out beyond one state and create continuing relationships and obligations with the citizens of another state are subject to regulation and sanctions in the other State for consequences of their actions.' * * * 'The foreseeability that is critical to the due process analysis is * * * that the defendant's conduct and connection with the forum State are such that he should reasonably expect to be haled into court there.' * * * This protects defendants from being forced to answer for their actions in a foreign jurisdiction based on 'random, fortuitous or attenuated' contacts. * * * Jurisdiction is proper, however, where contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State.'" Id. at 1123. (Emphasis in original and internal cites omitted.)

{¶ 27} Upon review of the evidence, the court finds that the Cayman defendants had sufficient "minimum contacts" with this state to justify the exercise of jurisdiction. Such contacts include the extended exchange of e-mail correspondence between plaintiff and defendant Ziemba (many of which bore the subject heading "? **From Ohio**"); the nature and content of those e-mails; and the arrangement by which the Cayman defendants agreed to pay defendant Erdey's $1,000 fee, for services performed in Ohio in connection with plaintiff's Cayman Islands surgery, out of the $2,615 per eye charged to plaintiff by defendant Cayman Surgical Group. Further, the court finds that the claims asserted by plaintiff against the Cayman defendants arise out of those contacts. Finally, the court has considered the burden on the Cayman defendants in defending this action in light of the factors set forth in *World–Wide Volkswagen Corp. v. Woodson* (1980), 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490, and finds that the exercise of personal jurisdiction is reasonable and does not offend "traditional notions of fair play and substantial justice." ·

{¶ 28} For the foregoing reasons, the motion of the Cayman defendants to dismiss plaintiff's complaint for lack of personal jurisdiction is not well taken and is hereby overruled.

### III. The Motion to Dismiss for Failure to State a Claim

{¶ 29} This branch of the Cayman defendants' motion is premised upon the "informed consent" signed by plaintiff immediately prior to her surgery but

after she was given eyedrops to dilate her eyes. The Cayman defendants note that this document includes a provision that neither the Cayman Surgical Group nor any of its officers or employees "shall have **any** liability, in contract or tort, directly or vicariously, for problems, complications or damage suffered" by plaintiff as a result of the intraocular lens procedure.

{¶ 30} This court has serious concerns about the content of this document and the circumstances under which it was signed. These issues need not be addressed at this time, however, because, in asking the court to dismiss plaintiff's complaint "for failure to state a claim," the Cayman defendants are proceeding under Civ.R. 12(B)(6).

{¶ 31} Dismissal of a claim pursuant to Civ.R. 12(B)(6) is appropriate only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *York v. Ohio State Hwy. Patrol* (1991), 60 Ohio St.3d 143, 144, 573 N.E.2d 1063; *Lin v. Gatehouse Constr. Co.* (1992), 84 Ohio App.3d 96, 99, 616 N.E.2d 519. In order for a court to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Civ.R. 12(B)(6), "it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery." *O'Brien v. Univ. Community Tenants Union, Inc.* (1975), 42 Ohio St.2d 242, 327 N.E.2d 753, syllabus. The court must presume all factual allegations in the complaint to be true and construe all inferences that may be reasonably drawn therefrom in favor of the nonmoving party. *Bridges v. Natl. Eng. & Contracting Co.* (1990), 49 Ohio St.3d 108, 112, 551 N.E.2d 163. In resolving a Civ.R. 12(B)(6) motion, a court is confined to the allegations contained in the complaint and may not consider evidentiary materials. *McGlone v. Grimshaw* (1993), 86 Ohio App.3d 279, 285, 620 N.E.2d 935. In short, issues regarding the effect, if any, of the "informed consent" on plaintiff's claims might properly be raised in a motion for summary judgment under Civ. R. 56, but they are not before the court on the instant motion to dismiss. Accordingly, the motion to dismiss for failure to state a claim upon which relief can be granted is not well taken and is hereby overruled.

{¶ 32} IT IS SO ORDERED.

Judgment accordingly.